# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### CHARLESTON DIVISION

| | | |
|---|---|---|
| Monica James, | ) | |
| | ) | C/A No. 2:09-3181-DCN-RSC |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **ORDER AND OPINION** |
| | ) | |
| Michael J. Astrue, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the court on United States Magistrate Judge Robert S. Carr's report and recommendation (R&R) that this court affirm the decision of the Commissioner denying plaintiff's application for disability benefits (DIB) and supplemental security income (SSI) under Titles II and XVI of the Social Security Act, Sections 205(g) and 1631(c)(3), as amended (42 U.S.C. §§ 405(g) and 1383(c)(3)). The record includes an R&R of the magistrate judge made in accordance with 28 U.S.C. § 636(b)(1)(B). Plaintiff has filed written objections to the R&R. For the reasons set forth below, the court adopts the R&R of the magistrate judge and affirms the Commissioner's decision denying plaintiff's application for DIB and SSI.

## I.  BACKGROUND

### A.  Procedural History

Plaintiff first filed for SSI on May 16, 2007, and for DIB on June 26, 2007, alleging that she became disabled on July 1, 2006, as a result of becoming infected with the human immunodeficiency virus (HIV) and concurrent and residual problems,

including fatigue, shortness of breath, and mental difficulties. Tr. 17, 36-40. The Social Security Administration (SSA) initially denied her application on October 9, 2007, and upon reconsideration on May 14, 2008. Tr. 17. On June 4, 2008, plaintiff requested an administrative hearing, which was held on October 15, 2008. Tr. 17. On February 10, 2009, the administrative law judge (ALJ) issued his decision, finding plaintiff not disabled because she was able to perform a full range of medium work and past relevant work as a cook's helper, and she had not been under a disability, as defined in the Social Security Act, from July 1, 2006, through the date of the ALJ's decision. Tr. 17-23. On October 23, 2009, the Appeals Council denied plaintiff's request for review and rendered the Commissioner's decision final. Tr. 1.

### B. Plaintiff's History

Plaintiff was born on May 30, 1963. Tr. 31. In 1992, she was diagnosed with HIV, and she has a past medical history of asthma, diabetes, and eczema. Tr. 37, 199. Plaintiff has an eleventh grade education with past relevant work experience as a cook's helper. Tr. 33, 119. She worked as a cook's helper for a restaurant from 2003 until 2005, and she changed jobs in 2006 to work as a cook's helper for a nursing home. Tr. 119. She worked at the nursing home for two weeks, but plaintiff stated that she was let go due to her inability to take out the heavy garbage. Tr. 34. Her last day of work was sometime in early 2006, and her alleged disability onset date is July 1, 2006. Tr. 36. Plaintiff indicated that at that time she had been losing weight, had poor memory, and had trouble performing everyday tasks. Tr. 36.

2

Plaintiff takes prescribed medications for her medical conditions.  Tr. 41.  She takes five medicines for HIV—Reyataz, Zithromax, Truvada, Norvir, and Bactrim—and Ethambutol for her breathing problems.  Tr. 41, 42.  Plaintiff indicated that these medications cause her to experience side effects, including fatigue and weakness.  Tr. 42.

On November 22, 2006, plaintiff presented to Palmetto Richland Hospital's Emergency Room (Palmetto Richland) for general body aches.  Tr. 218.  The physician, Dr. Joseph Campbell, reported that plaintiff was seen two days prior in the Emergency Department at Baptist Hospital and was diagnosed with pneumonia and given Bactrim.  Tr. 218.  Plaintiff had a temperature of 100.4°F; however, she stated that she was feeling well overall.  Tr. 218.  Plaintiff denied any respiratory symptoms and was negative for chills, vomiting, diarrhea, rash, seizure, and syncope.  Tr. 218.  She was positive for subjective fevers and cough, but her shortness of breath had improved substantially and was "actually resolved" that day.  Tr. 218.  Dr. Campbell reported that plaintiff was alert, oriented, and in no acute distress with adequate range of motion in her extremities.  Tr. 219.  Dr. Campbell noted that plaintiff was a "well-appearing, well-nourished African American female."  Tr. 219.

On February 23, 2007, plaintiff began treatment at the Ryan White Title II Clinic at Midland Care Consortium (MCC).  Tr. 199.  The record shows that prior to this doctor's visit, plaintiff had been without care for approximately thirteen to fourteen years.  Tr. 199.  Her primary treating physician was Dr. Sangita Dash.  Tr. 28.  Plaintiff revealed that she smoked half a pack of cigarettes each day and occasionally used alcohol, although she had abused alcohol in the past.  Tr. 199.  In addition, plaintiff stated that she

used to smoke crack and that she currently snorted cocaine on a weekly basis. Tr. 199.

She stated that she smoked marijuana on a daily basis for her appetite. Tr. 199. Plaintiff

told Dr. Dash that she was seen in the emergency room in November 2006 and treated for

pneumonia, but she did not have a follow-up appointment. Tr. 199. Also, Dr. Dash's

notes indicate that plaintiff had a cervical mass at the time of the emergency and that

plaintiff believed that she became HIV positive through heterosexual sex with her spouse,

denying any intravenous drug use. Tr. 199. A review of her symptoms during this

appointment revealed that plaintiff became easily agitated, possessed a poor appetite, did

not sleep well, and had occasional headaches that were relieved with Tylenol; however,

she denied blurred vision, chest pain, shortness of breath, nausea, vomiting, diarrhea, and

constipation. Tr. 199-200. Dr. Dash's notes show that plaintiff did have some

periumbilical pain and pain in her left thigh, which was relieved by Tylenol, but had no

night sweats, fevers, cough, or congestion. Tr. 200. Plaintiff stated that she became

easily fatigued and complained of dry skin, but she was no longer having any intermittent

vaginal bleeding and no vaginal discharge. Tr. 200. On this visit, Dr. Dash indicated that

plaintiff weighed 156 pounds and was in no acute distress. Tr. 200. She was alert and

oriented. Tr. 200. Plaintiff had some lichenification under her breast and groin with

some dime- to quarter-sized rashes on her thighs. Tr. 200. She had some generalized

abdomen tenderness, and she had a lesion approximately one centimeter from her left

labia majora, which plaintiff stated was painless. Tr. 200. She had a lesion on her cervix,

and she had a macular, red rash bilaterally to her breast. Tr. 200. Dr. Dash documented

plaintiff's strength as being equal bilaterally, upper and lower. Tr. 200.

On March 13, 2007, plaintiff went to MCC for a follow-up appointment.  Tr. 197. The nurse practitioner, Suzanne Freeman, listed plaintiff's present medical conditions as HIV, Tinea (ringworm), and high grade squamous intraepithelial lesion.  Tr. 197.  Nurse Freeman documented that plaintiff had begun to take some of her medications and was feeling well.  Tr. 197.  Plaintiff reported that she continued to have itchy skin and occasionally had headaches after waking up, which were relieved with Tylenol.  Tr. 197. Plaintiff denied any cough, congestion, fevers, night sweats, abdominal pain, nausea, vomiting, or diarrhea.  Tr. 197.  Plaintiff lost two pounds, was in no acute distress, and was alert and oriented.  Tr. 197.  Nurse Freeman's notes show that plaintiff had lesions on her extremities and a flaky scalp.  Tr. 197.

On May 16, 2007, plaintiff had a follow-up appointment at MCC.  Tr. 194.  The physician, Dr. Divya Ahuja, noted that in the weeks prior to this appointment, the nurses received multiple calls from plaintiff's sister saying that plaintiff was not taking her medicine.  Tr. 194.  Plaintiff, on the other hand, stated that she was taking her medicine. Tr. 194.  Dr. Ahuja observed that plaintiff barely made eye contact, was "very restless, jittery, agitated," and looked "chronically unwell"; however, a ten-point review of her systems was negative.  Tr. 194.  Dr. Ahuja noted that plaintiff weighed 140 pounds, fourteen pounds less than on her previous visit.  Tr. 194.

On May 27, 2007, plaintiff went to Palmetto Richland because of foot pain.  Tr. 221.  The attending physician, Dr. Neely Green, reported that plaintiff was complaining of "swollen, red feet."  Tr. 221.  Dr. Green's notes indicate that plaintiff had swelling and pain in the right foot, and her right foot hurt when she walked.  Tr. 221.  Plaintiff also had

5

pain in the ankle and reported increased wheezing and shortness of breath; however, she

was negative for chest pain and fever.  Tr. 221.  Plaintiff had no vomiting, abdominal

pain, dizziness, syncope, weakness, numbness, or trauma.  Tr. 221.  She was positive for

diarrhea and had a temperature of 100.3°F.  Tr. 222.  A chest exam revealed a

"questionable solid area of consolidation in right mid lung field" and "some slight

fullness of the right hilum."  Tr. 224.

On May 30, 2007, plaintiff returned to MCC for an appointment.  Tr. 189.  The

nurse practitioner, Nurse Freeman, reported that plaintiff had been to the emergency room

recently to seek treatment for her foot and leg pain and was given medication for those

ailments.  Tr. 189.  Plaintiff's sister was present on this visit and stated that plaintiff was

having some memory issues.  Tr. 189.  Plaintiff seemed to be confused, but she stated that

she was taking all of her medicine.  Tr. 189.  Plaintiff indicated that she recently had an

alcohol binge and snorted cocaine and that her foot and leg pain had increased.  Tr. 189.

She stated that she walked with a slight limp, but the medicine made her feel better.  Tr.

189.  Plaintiff continued to smoke about a pack and a half of cigarettes per day, did not

follow up with her abnormal pap smear, and did not return to have her purified protein

derivative of tuberculin test (PPD) read.  Tr. 189.  Furthermore, plaintiff indicated that

she only vomited after she took the medicine for her leg and foot, and she denied any

cough or congestion, fevers or night sweats, abdominal pain, chest pain, or shortness of

breath.  Tr. 189.  Nurse Freeman reported that plaintiff weighed 135 pounds, was in no

acute distress and was alert and oriented.  Tr. 189-90.  Also, plaintiff had a small amount

of edema to her right foot and had a few reddened areas on her left lower leg.  Tr. 190.

6

On June 13, 2007, plaintiff returned to MCC for a follow-up appointment. Tr. 186. Plaintiff reported that her foot was getting better, her appetite was good, and that she generally felt good. Tr. 186. She denied headaches, cough, congestion, fevers, night sweats, abdominal pain, nausea, vomiting or diarrhea. Tr. 186. Plaintiff did complain of some urinary frequency. Tr. 186. Nurse Freeman reported that plaintiff weighed 132 pounds, which was down from her previous visit, and that she was in no acute distress. Tr. 186. Furthermore, plaintiff was alert and oriented. Tr. 186. She also had a quarter-sized lesion on her right lower leg and a lesion on her left shin. Tr. 186.

On June 25, 2007, plaintiff had a chest X-ray performed at Palmetto Richland. Tr. 229. The X-ray revealed: "a bihilar prominence, more pronounced on the right. There is a small opacity extending just lateral to the right hilum. The cardiopericardial silhouette is unremarkable. There is also increased prominence of the right paratracheal region." Tr. 229.

On July 2, 2007, plaintiff went to MCC for a follow-up appointment. Tr. 183. Dr. Dash indicated in her notes that since plaintiff's previous visit, she was doing well and had been compliant with her medications. Tr. 183. Plaintiff reported that her feet felt better and that she had no fever, chills, night sweats, cough, shortness of breath, abdominal pain, nausea, vomiting, or diarrhea, and no loss of weight or loss of appetite. Tr. 183. Plaintiff weighed 145 pounds and was alert, awake, and oriented with no acute distress. Tr. 183. In addition, the lesion on plaintiff's right leg was apparently getting smaller. Tr. 183. Plaintiff did complain of blurry vision on this visit. Tr. 184.

On July 3, 2007, plaintiff had an abdominal and chest X-ray performed at Palmetto Richland. Tr. 226. The X-ray revealed: "mediastinal and hilar lymphadenopathy," "right paratracheal very large lymph nodes," and "bilateral innumerable rounded airspace opacities and cavities." Tr. 227. The report also indicated that pulmonary tuberculosis was the "diagnosis of exclusion." Tr. 227.

On July 16, 2007, it appears that plaintiff had some tissue samples taken at Palmetto Richland. Tr. 231. The report lists her clinical information as "HIV with pulmonary nodule and cavitary disease RLL." Tr. 231. The report also states that plaintiff had "fragments of pulmonary parenchyma with rare small granulomata"; however, it also states that "features diagnostic for malignancy are not present." Tr. 231. A bronchial brushing and washing performed on the same date revealed "numerous benign bronchial epithelial cells and macrophages." Tr. 233, 235. Also, on July 17, 2007, plaintiff presented to Palmetto Richland for a bronchoscopy, a surgical procedure. Tr. 237. The surgery was performed by Dr. Lydia Chang, and she reported that no immediate complications were found. Tr. 237. A post-bronchoscopy chest exam revealed "stable opacities" and "no pneumothorax." Tr. 239.

On July 30, 2007, plaintiff had a cervical biopsy performed at Palmetto Richland. Tr. 242. The report stated that plaintiff had severe dysplasia/carcinoma with keratinizing features present in her uterine cervix. Tr. 242. Plaintiff also had endocervical curetting. Tr. 242.

On August 6, 2007, plaintiff returned to MCC for a follow-up appointment. Tr. 179. Since her previous visit, plaintiff had a biopsy which was positive for small

8

granulomatous lesions.  Tr. 179.  Dr. Dash reported that plaintiff also went to the gynecologist and had a colposcopy performed, which showed an abnormal result.  Tr. 179.  Otherwise, plaintiff had been doing well.  Tr. 179.  Plaintiff gained twenty-one pounds since her last visit and had no fever, chills, night sweats, cough, shortness of breath, abdominal pain, nausea, vomiting, or diarrhea.  Tr. 179.  She denied any respiratory symptoms, including shortness of breath on exertion.  Tr. 179.  Dr. Dash indicated in her notes that plaintiff was alert, awake and oriented with no acute distress.  Tr. 179.

On August 13, 2007, plaintiff had a gynecological appointment at Palmetto Health Women's Center.  Tr. 260.  Plaintiff denied fevers, chills, sweats, dyspnea, nausea, vomiting, diarrhea, and constipation.  Tr. 261.  The assessment indicated that plaintiff would need a cold knife cone procedure performed on her.  Tr. 261.  Also on August 13, plaintiff had an eye exam performed, which revealed some lens-related issues.  Tr. 205.

On August 23, 2007, Dr. Lawrence Hankin performed a medical examination of plaintiff.  Tr. 208.  Dr. Hankin reported that plaintiff had continuous substantial fatigue and could not walk more than "a few yards" without becoming short of breath and getting tired.  Tr. 208.  Dr. Hankin indicated in his notes that plaintiff had regular bouts with night sweats and suffered from eye problems.  Tr. 208.  In addition, plaintiff was documented as having memory trouble with few headaches.  Tr. 209.  Furthermore, Dr. Hankin's notes show that plaintiff had no chest pain and no abdominal pains; however, plaintiff was reported as having shortness of breath with no substantial wheezing.  Tr. 209.  Dr. Hankin stated that plaintiff was "short of breath even sitting at rest," and she

9

weighed 172 pounds.  Tr. 209.  Dr. Hankin reported that plaintiff had complete mobility of the neck and shoulders with a grip strength of 5 out of 5 in both hands.  Tr. 210. Plaintiff had full mobility of the hips and the back, and her knees were not swollen.  Tr. 210.  In conclusion, Dr. Hankin stated that "at the present time with this patient's fatigue and breathing difficulties, it would be impossible for her to carry on any meaningful work."  Tr. 210.

On August 24, 2007, plaintiff had an appointment with Dr. Nicholas Depace, a psychologist, to have a mental examination performed.  Tr. 211, 215-16.  This appointment was required by Disability Determination Services (DDS) to assess plaintiff's "allegations as they relate to difficulties with nerves and memory."  Tr. 207, 211.  Dr. Depace observed that plaintiff was alert and oriented "in all spheres" and possessed an awareness of current events.  Tr. 213.  Plaintiff reported that her mood was "pretty good," and Dr. Depace wrote in his notes that plaintiff was in no acute distress. Tr. 213.  Furthermore, Dr. Depace reported that plaintiff had a "fairly appropriate" tolerance for frustration and appeared to be functioning intellectually most likely in the "low average range."  Tr. 213.  Dr. Depace's notes reveal that plaintiff did not illustrate any significant "mood or anxiety processes that would impair her functioning at this time," and her memory appeared to be fine.  Tr. 214.  Dr. Depace wrote that "there were no significant other observations to suggest that she might be experiencing any type of problematic cognitive process secondary to her medical condition."  Tr. 214.  Plaintiff met the criteria for marijuana and cocaine abuse, and she stated that she could perform a majority of activities without any significant difficulty.  Tr. 214.  Plaintiff's concentration

seemed to be impaired according to Dr. Depace, and plaintiff reported that she becomes tired easily and consequently "performs some inside chores only minimally." Tr. 214.

On September 5, 2007, plaintiff had another follow-up appointment at MCC. Tr. 194. On this occasion, Dr. Dash noted that the positive acid-fast bacillus (AFB) in her sputum was really mycobacterium avium complex (MAC), indicating that plaintiff was experiencing "immune reconstitution." Tr. 281. Dr. Dash indicated that plaintiff was virtually without symptoms, except that she did on occasion have shortness of breath on exertion. Tr. 281. Plaintiff had no fever, chills or night sweats, cough, abdominal pain, nausea, vomiting, or diarrhea. Tr. 281. On this visit, plaintiff weighed 174 pounds and was alert, awake, and oriented with no acute distress. Tr. 281.

On September 13, 2007, plaintiff had a gynecological appointment at Palmetto Health Women's Center. Tr. 258. The record shows that plaintiff was not experiencing any pain. Tr. 258.

On October 1, 2007, plaintiff had a gynecological appointment at Palmetto Health Women's Center. Tr. 254. The record shows that plaintiff was not experiencing pain and her ten systems were negative. Tr. 256. Plaintiff was reported as being well-developed, well-nourished, and in no acute distress. Tr. 256. Furthermore, the record indicates that plaintiff's exercise endurance was "greater than 4 metabolic equivalents" and her upcoming surgery would be a "low surgical risk predictor for perioperative cardiac events." Tr. 257.

On October 3, 2007, plaintiff went to MCC for a follow-up exam. Tr. 278. Plaintiff revealed that she was scheduled to have a colposcopy on October 5. Tr. 278.

11

The record indicates that plaintiff had no nausea, vomiting, diarrhea, fever, chills, or night sweats. Tr. 278. The nurse practitioner described plaintiff as alert, oriented, and in no acute distress. Also on October 3, plaintiff underwent a vocational analysis, which concluded that her exertional impairment restricts her to a medium range of work. Tr. 144. Furthermore, the analysis concluded that plaintiff's mental limitations were non-severe. Tr. 144.

On October 5, 2007, plaintiff had a colposcopy at Palmetto Richland. Tr. 244. An endometrium biopsy and cervical cone specimens were taken, and the report indicated that there was a benign proliferative endometrium and a "range of dysplasia from mild keratinizing dysplasia to severe metaplastic dysplasia." Tr. 244. Also, on October 5, 2007, Dr. Gertrude Anyakwo performed a cold-knife conization of the cervix, and no apparent complications were reported. Tr. 246.

On October 12, 2007, plaintiff had a gynecological visit at Palmetto Health Women's Center. Tr. 250. The record indicates that plaintiff was experiencing pain in her pelvic area on her right side since her surgery. Tr. 250. Plaintiff denied fevers, chills, nausea, vomiting, diarrhea, constipation, vaginal discharge, or abnormal vaginal bleeding. Tr. 252. Plaintiff reported only light bleeding and was documented as being well-nourished and in no acute distress. Tr. 252.

On November 5, 2007, plaintiff had an appointment at MCC. Tr. 275. Since her last visit, plaintiff had been doing "okay." Tr. 275. Dr. Dash indicated that plaintiff may need a hysterectomy based on her colposcopy. Tr. 275. Dr. Dash described plaintiff as alert, awake, oriented, and in no acute distress. Tr. 275.

12

On January 16, 2008, plaintiff went to MCC for a follow-up appointment.  Tr. 271.  Plaintiff reported that since her last visit she had been doing "pretty good."  Tr. 271.  She denied any fevers, chills, nausea, vomiting, loss of weight, or loss of appetite.  Tr. 271.  Plaintiff did gain a lot of weight, however.  Tr. 271.  Dr. Dash documented plaintiff as awake, alert, oriented, and in no acute distress.  Tr. 271.

On May 13, 2008, plaintiff underwent a vocational analysis performed by DDS.  Tr. 159.  The examiner noted that plaintiff's exertional impairment restricted her to a medium range of work and her non-exertional impairments did not restrict plaintiff to "less than the wide range of work within her exertional capacity."  Tr. 159.  Plaintiff's mental impairment was noted as non-severe.  Tr. 159.  In addition, the vocational analysis indicated that plaintiff retained a capacity for past relevant work as a cook "as is generally performed in the national economy."  Tr. 159.

On May 13, 2008, plaintiff was also evaluated by Dr. Kukla for a Physical Residual Functional Capacity Assessment.  Tr. 284-85.  This assessment was referred to Dr. Kukla in order to assist the SSA in arriving at a decision regarding plaintiff's claims.  Tr. 285.  Dr. Kukla documented plaintiff's primary diagnosis as HIV positive with respiratory issues.  Tr. 285.  Plaintiff was secondarily diagnosed with vision problems, uterus problems, and substance abuse issues.  Tr. 285.  In terms of exertional limitations, plaintiff is documented as being able to "occasionally lift and/or carry (including upward pulling)" fifty pounds while she can "frequently lift and/or carry (including upward pulling)" twenty-five pounds.  Tr. 286.  The record stated that plaintiff can "stand and/or walk (with normal breaks)" for a total of approximately six hours in an eight-hour

13

workday, and she has the ability to sit, with normal breaks, for a total of approximately

six hours in an eight-hour workday.  Tr. 286.  In terms of pushing or pulling, including

the operation of hand or foot controls, plaintiff was shown to have no limitations other

than those previously mentioned.  Tr. 286.  Dr. Kukla described plaintiff's HIV and

respiratory issues as severe, while her vision issues were not severe.  Tr. 287.

Furthermore, plaintiff's cancer of the uterus was noted as producing no impairment.  Tr.

287.  In terms of postural limitations, the record shows that plaintiff frequently climbs,

balances, stoops, kneels, crouches, and crawls.  Tr. 287.  Dr. Kukla reported that plaintiff

was negative for manipulative, visual, communicative, and environmental limitations.

Tr. 288-89.

On June 11, 2008, plaintiff went to MCC for a follow-up exam.  Tr. 295.  Plaintiff

reported that she had no complaints and has been "exercising and watching her diet,

although it appears that she still gained about six pounds since her last visit."  Tr. 295.

Plaintiff denies any fevers, chills, cough, shortness of breath, abdominal pain, nausea, or

vomiting.  Tr. 295.  Plaintiff indicated that she was experiencing some diarrhea.  Tr. 295.

Dr. Dash reported that plaintiff was alert, awake, oriented, and in no acute distress.  Tr.

295.

On August 18, 2008, plaintiff had an appointment at Palmetto Health Eye Center

with Dr. Thomas Frederici.  Tr. 304.  Plaintiff complained of gradually decreasing vision,

and she was given a prescription for eye glasses.  Tr. 305.

On September 15, 2008, plaintiff returned to MCC for a follow-up appointment.

Tr. 319.  Plaintiff reported that she had been doing well since her previous visit but was

14

gaining weight and smoking cigarettes.  Tr. 319.  Plaintiff had no fevers, chills, night sweats, cough, shortness of breath, abdominal pain, nausea, vomiting, or diarrhea.  Tr. 319.  Dr. Dash documented plaintiff as being alert, awake, oriented, and in no acute distress.  Tr. 319.

On November 20, 2008, plaintiff had a follow-up exam at MCC.  Tr. 316.  On this occasion, plaintiff complained of a fever and an increased cough with "yellowish expectoration," as well as pain in her chest upon taking breaths.  Tr. 316.  In addition, plaintiff stated that she had a "recent upper respiratory infection," including a runny nose, cough, and a sore throat.  Tr. 316.  Dr. Dash's notes indicate that plaintiff was alert, awake, oriented, and in no acute distress.  Tr. 316.

On January 21, 2009, plaintiff returned to MCC for an appointment.  Tr. 313.  Dr. Dash reported that since plaintiff's last visit, she had been diagnosed with "new onset diabetes" and was hospitalized for "diabetic ketoacidosis."  Tr. 313.  Plaintiff started insulin and otherwise had no complaints.  Tr. 313.  Plaintiff denied fevers, chills, night sweats, cough, shortness of breath, abdominal pain, nausea, vomiting, or diarrhea.  Tr. 313.  Dr. Dash described plaintiff as alert, awake, oriented, and in no acute distress.  Tr. 313.

On April 29, 2009, plaintiff had an appointment at MCC.  Tr. 310.  Dr. Dash reported that since plaintiff's last visit, she had been doing well and had no complaints.  Tr. 310.  Additionally, plaintiff had been doing well with the insulin for her diabetes, and she denied fevers, chills, night sweats, cough, shortness of breath, abdominal pain, nausea, vomiting, or diarrhea.  Tr. 310.  Dr. Dash stated that plaintiff planned to return to

15

part-time employment and had been exercising, eating healthy foods, and wanted to lose weight. Tr. 310.

At the hearing before the ALJ, plaintiff testified that she weighs 210 pounds, but she considers her normal weight to be 180 pounds. Tr. 33. Plaintiff testified that she has an eleventh grade education. Tr. 34. Plaintiff further testified that she only worked for two weeks at her last job because, in addition to cooking, she was required to carry out the garbage, which was too heavy for her to take out. Tr. 34-35. Consequently, she stated that "they let me go." Tr. 35. Plaintiff stated that her last day of work was sometime in early 2006, which was during the time when she had lost weight and "couldn't really do" and "couldn't remember how to do" anything. Tr. 36. Plaintiff testified that she worked for twelve to fifteen years or more after she was diagnosed with HIV. Tr. 37. Furthermore, plaintiff revealed that she has had problems with her right foot and has had to get her uterus scraped before. Tr. 37. She said that being infected with HIV has affected her eyesight and memory, and she testified that she gets tired easily and has night sweats. Tr. 38. Plaintiff stated that she has pain in her bones and problems breathing; she stated that she thinks she has bronchitis. Tr. 39. She said that she smokes cigarettes and previously used cocaine and crack. Tr. 40. She stated that she has not used any drugs since July 1, 2006. Tr. 40.

Plaintiff testified that she acquired HIV from the man she was going to marry; plaintiff said that this man did not tell her that he had HIV and that she found out shortly before he died. Tr. 40. Plaintiff further testified that she takes the following medications: Reyataz, Zithromax, Truvada, Norvir, Bactrim, and Ethambutol. Tr. 41. She testified

16

that these medications make her tired.  Tr. 42.  Plaintiff stated that she has problems

walking and standing and that she can only walk a half of a block without becoming tired.

Tr. 43.  Plaintiff further stated that sitting in one position bothers her because her legs get

stiff and her joints lock up.  Tr. 43-44.  She said that she can lift a five-pound bag of

potatoes one time when she goes to the grocery store, and she stated that she does not

drive and has never had a driver's license.  Tr. 44.  Plaintiff testified that when she bends

over she gets lightheaded and that she has fallen before.  Tr. 48.  Plaintiff stated that she

gets $154 in food stamps, presumably per month, and occasionally babysits to make extra

money.  Tr. 49.

          The ALJ followed the five-step sequential evaluation in determining whether

plaintiff was disabled.  Tr. 18.  At the first step, the ALJ found plaintiff had not engaged

in substantial gainful activity since July 1, 2006, the alleged disability onset date.  Tr. 19.

At the second step, the ALJ found that plaintiff had the following severe impairment:

human immunodeficiency virus (HIV).  Tr. 19.  At the third step, the ALJ found

plaintiff's impairment or combination of impairments were not presumptively disabling.

Tr. 20.  At the fourth step, the ALJ found that plaintiff had the residual functional

capacity to perform the full range of medium work.  Tr. 23.  In determining plaintiff's

residual functional capacity, the ALJ considered the opinions of Dr. Dash and Dr.

Hankin.  Tr. 21.  The ALJ found that Dr. Hankin's opinion was entitled to no weight.  Tr.

23.  The ALJ discounted Dr. Hankin's opinion because "Dr. Hankin indicated that the

claimant is unable to work secondary to fatigue and shortness of breath.  There is no

evidence of chronic impairment that would cause shortness of breath to the degree alleged

17

and fatigue is [a] subjective complaint[] . . ." Tr. 23.  Also, there was "no evidence of opportunistic infection." Tr. 23.  Concluding the fourth step, the ALJ found that plaintiff's residual functional capacity enabled her to perform the past relevant work as a cook's helper.  Tr. 23.  Therefore, the ALJ found that plaintiff was not disabled.  Tr. 23.

## II.  STANDARD OF REVIEW

This court is charged with conducting a de novo review of any portion of the magistrate judge's report to which a specific, written objection is made.  28 U.S.C. § 636(b)(1).  A party's failure to object is accepted as agreement with the conclusions of the magistrate judge.  See Thomas v. Arn, 474 U.S. 140 (1985).  This court is not required to review, under a de novo standard, or any other standard, the factual findings and legal conclusions of the magistrate judge to which the parties have not objected.  See id. at 149-50.  A party's general objections are not sufficient to challenge a magistrate judge's findings.  Howard v. Sec'y of Health & Human Servs., 932 F.2d 505, 508-09 (6th Cir. 1991).  The recommendation of the magistrate judge carries no presumptive weight, and the responsibility to make a final determination remains with this court.  Mathews v. Weber, 423 U.S. 261, 270-71 (1976).  This court may accept, reject, or modify the report of the magistrate judge, in whole or in part, or may recommit the matter to him with instructions for further consideration.  28 U.S.C. § 636(b)(1).

Although this court may review the magistrate judge's recommendation de novo, judicial review of the Commissioner's final decision regarding disability benefits "is limited to determining whether the findings of the [Commissioner] are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907

18

F.2d 1453, 1456 (4th Cir. 1990).  "Substantial evidence" has been defined as,

> evidence which a reasoning mind would accept as sufficient to support a
> particular conclusion.  It consists of more than a mere scintilla of evidence
> but may be somewhat less than a preponderance.  If there is evidence to
> justify a refusal to direct a verdict were the case before a jury, then there is
> "substantial evidence."

Id. (internal citations omitted).  "[I]t is not within the province of a reviewing court to

determine the weight of the evidence, nor is it the court's function to substitute its

judgment for that of the [Commissioner] if his decision is supported by substantial

evidence."  Id.  Instead, when substantial evidence supports the Commissioner's decision,

this court must affirm that decision even if it disagrees with the Commissioner.  Blalock

v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972).  "Ultimately, it is the duty of the

administrative law judge reviewing a case, and not the responsibility of the courts, to

make findings of fact and to resolve conflicts in the evidence."  Hays, 907 F.2d at 1456.

### III.  DISCUSSION

The Social Security Act defines "disability" as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months."  42 U.S.C. §

423(d)(1)(A).  The Social Security Regulations establish a sequential evaluation process

to determine whether a claimant is disabled.  See 20 C.F.R. §§ 404.1520, 416.920.  Under

this process, the ALJ must determine, in sequence: (1) whether the claimant is currently

engaged in substantial gainful activity; (2) if not, whether the claimant has a severe

impairment; (3) if so, whether that severe impairment meets or equals an illness contained

in 20 C.F.R. Part 4, Subpart P, Appendix 1, which warrants a finding of disability without considering vocational factors; (4) if not, whether the impairment prevents him or her from performing past relevant work; and (5) if so, whether the claimant is able to perform other work considering both his remaining physical and mental capacities (defined as Residual Functional Capacity or "RFC") and his vocational capabilities (age, education, and past work experience) to adjust to a new job.  Hall v. Harris, 658 F.2d 260, 264-64 (4th Cir. 1981); see also Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (quoting 20 C.F.R. § 416.920)).  The applicant bears the burden of production and proof during the first four steps of the inquiry.  Pass, 65 F.3d at 1203 (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).  If the sequential evaluation process proceeds to the fifth step, the burden shifts to the Commissioner to show that other work is available in the national economy that the claimant could perform.  Id.; see also Bowen v. Yuckert, 482 U.S. 137, 146 n.5 (1987) (discussing burden of proof).

In this case, the ALJ determined that plaintiff suffers from a severe impairment but is able to perform past relevant work.  Tr. 19-24.  The ALJ determined that plaintiff retained the residual functional capacity to perform the past relevant work as a cook's helper.  Tr. 23.  As a result, the ALJ found that plaintiff was not entitled to DIB or SSI.  Tr. 24.

Plaintiff's sole objection relates to the ALJ's assessment of Dr. Hankin's opinion regarding plaintiff's alleged disability.  According to plaintiff, the ALJ erred by failing to give proper weight to the opinion of Dr. Hankins, the physician in the most appropriate position to provide an opinion on plaintiff's impairments.  The court disagrees.

20

Courts evaluate and weigh medical opinions pursuant to the following
non-exclusive list: (1) whether the physician has examined the applicant, (2) the
treatment relationship between the physician and the applicant, (3) the supportability of
the physician's opinion, (4) the consistency of the opinion with the record, and (5)
whether the physician is a specialist.  Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir.
2005) (citing 20 C.F.R. § 404.1527 (2005)).  Opinions of treating physicians occupy a
special status.  "[T]he treating physician rule generally requires a court to accord greater
weight to the testimony of a treating physician."  Hunter v. Sullivan, 993 F.2d 31, 35 (4th
Cir.1992) (per curiam); see also Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir.1987)
("[The treating physician] rule requires that the opinion of a claimant's treating physician
be given great weight and may be disregarded only if there is persuasive contradictory
evidence."); Mitchell v. Schweiker, 699 F.2d 185, 187 (4th Cir.1983) (same).  A treating
physician's opinion is also given more weight "since these sources are likely to be the
medical professionals most able to provide a detailed, longitudinal picture of your
medical impairment(s) and may bring a unique perspective to the medical evidence that
cannot be obtained from the objective medical findings alone or from reports of
individual examinations, such as consultative examinations or brief hospitalizations."  20
C.F.R. § 404.1527(d)(2).  "A treating physician's opinion on the nature and severity of
the claimed impairment is entitled to controlling weight if it is well-supported by
medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent
with the other substantial evidence in the record."  Mastro v. Apfel, 270 F.3d 171, 178
(4th Cir. 2001) (citing 20 C.F.R. § 416.927).  "Thus, '[b]y negative implication, if a

physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.'" <u>Id.</u> (citing <u>Craig v. Chater</u>, 76 F.3d 585, 590 (4th Cir. 1996)).  "Under such circumstances, the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." <u>Id.</u> (citing <u>Hunter</u>, 993 F.2d at 35).

The Code of Federal Regulations draws a distinction between a physician's medical opinions and his legal conclusions.  "Medical opinions are statements from physicians . . . that reflect judgments about the nature and severity of [the claimant's] impairment(s), including . . . symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), . . . and [the claimant's] physical or mental restrictions." 20 C.F.R. § 404.1527(a)(2).  Legal conclusions, on the other hand, are opinions on issues reserved to the ALJ, such as "statement[s] by a medical source that [the claimant is] 'disabled' or 'unable to work.'"  20 C.F.R. § 404.1527(e)(1).  While the ALJ must give a treating physician's medical opinions special weight in certain circumstances, the ALJ is under no obligation to give a treating physician's legal conclusions any heightened evidentiary value.  <u>See</u> 20 C.F.R. § 404.1527(e)(3) ("We will not give any special significance to . . . [a treating physician's legal conclusions]. . . .").  The ALJ is not free, however, simply to ignore a treating physician's legal conclusions, but must instead "evaluate all the evidence in the case record to determine the extent to which the [treating physician's legal conclusion] is supported by the record."  Social Security Ruling 96-5p at *3.

Here, the record presents "persuasive contradictory evidence" allowing the ALJ to avoid giving Dr. Hankin's opinion the great weight the treating physician rule ordinarily requires.  Specifically, none of the other physicians who treated plaintiff, especially Dr. Dash at MCC, documented the severity of symptoms found by Dr. Hankin.[1]  Similarly, even though plaintiff attended numerous appointments with several different physicians, the examination by Dr. Hankin was the only one that resulted in an opinion that plaintiff cannot possibly do any "meaningful" work.  Tr. 210.  None of the medical records leading up to, or subsequent to, plaintiff's appointment with Dr. Hankin even remotely support Dr. Hankin's view that it would "be impossible for her to carry on any meaningful work."  Tr. 210.  Moreover, plaintiff saw Dr. Hankin on only one occasion; however, she sought treatment at MCC and other facilities regularly for years.

On August 6, 2007, which was slightly more than two weeks prior to the appointment with Dr. Hankin, plaintiff presented to MCC for a follow-up appointment. Tr. 179.  Dr. Dash reported that plaintiff went to the gynecologist and had a colposcopy done, which showed an abnormal result.  Tr. 179.  Otherwise, plaintiff was "doing good." Tr. 179.  Plaintiff was documented as having no fever, chills, night sweats, cough, shortness of breath, abdominal pain, nausea, vomiting, or diarrhea.  Tr. 179. Furthermore, Dr. Dash's notes indicate that plaintiff denied any respiratory symptoms, including shortness of breath on exertion.  Tr. 179.  Additionally, Dr. Dash wrote in her notes that plaintiff was alert, awake, and oriented with no acute distress.  Tr. 179.

---

[1]Assuming Dr. Hankin is a "treating physician," the court would note that many of the other physicians who treated plaintiff would also qualify as such.

23

Almost two weeks later, on August 23, 2007, plaintiff went to Dr. Hankin for a consultative visit. Tr. 208. Dr. Hankin reported that plaintiff had continuous substantial fatigue and cannot walk more than "a few yards" without becoming short of breath and getting tired. Tr. 208. Dr. Hankin indicated in his notes that plaintiff has regular bouts with night sweats and shortness of breath with no substantial wheezing. Tr. 208-09. Furthermore, Dr. Hankin stated that plaintiff was "short of breath even sitting at rest." Tr. 209. When reading plaintiff's medical records in chronological order, it seems as if something very serious must have happened to plaintiff in that two-week time span between her appointment at MCC on August 6, 2007, and the appointment with Dr. Hankin. On March 13, May 30, June 13, July 2, and August 6, 2007, plaintiff was negative for night sweats and shortness of breath, yet, during her one visit with Dr. Hankins, she was found to suffer from regular night sweats and shortness of breath "even sitting at rest." Tr. 209. On August 6, 2007, Dr. Dash had clearly written in her notes that plaintiff had no respiratory problems including shortness of breath on exertion.

Approximately two weeks after plaintiff's visit with Dr. Hankin, on September 5, 2007, plaintiff had another follow-up appointment at MCC. Tr. 194. Dr. Dash indicated that plaintiff was virtually without symptoms, except that she occasionally experiences shortness of breath on exertion. Tr. 281. Experiencing occasional shortness of breath on exertion is significantly different from experiencing shortness of breath "even sitting at rest" and not being able to walk more than "a few yards" without becoming short of breath. Tr. 208-09. Dr. Dash's notes reveal that plaintiff had no fever, chills, night sweats, cough, shortness of breath, abdominal pain, nausea, vomiting, or diarrhea on

September 5.  Tr. 281.  Plaintiff was reported as being alert, awake, and oriented with no acute distress.  Tr. 281.  There is no mention of plaintiff being short of breath while sitting at rest and no indication that plaintiff cannot work.

On October 3, 2007, plaintiff underwent a vocational analysis which concluded that her exertional impairment restricts her to a medium range of work.  Tr. 144.  Furthermore, the analysis concluded that plaintiff's mental limitations were non-severe.  Tr. 144.  This vocational analysis was conducted at the request of DDS for the purpose of determining whether plaintiff's impairment was severe enough to prevent her from working, and the analysis did not find that she could not work.  Tr. 132, 144.  In fact, the vocational analysis indicated that plaintiff retains a capacity for past relevant work as a cook "as is generally performed in the national economy."  Tr. 159.

On May 13, 2008, plaintiff was evaluated by Dr. Kukla for a Physical Residual Functional Capacity Assessment.  Tr. 284-85.  This assessment was referred to Dr. Kukla in order to assist the SSA in arriving at a decision regarding plaintiff's claim.  Tr. 285.  In terms of exertional limitations, plaintiff was documented as being able to "occasionally lift and/or carry (including upward pulling)" fifty pounds while she can "frequently lift and/or carry (including upward pulling)" twenty-five pounds.  Tr. 286.  This is drastically different from plaintiff's testimony at the administrative hearing that she could only lift a five-pound bag of potatoes once.  Tr. 44.  The record depicts that plaintiff can "stand and/or walk (with normal breaks)" for a total of approximately six hours in an eight-hour workday, and she has the ability to sit, with normal breaks, for a total of approximately six hours in an eight-hour workday.  Tr. 286.  Therefore, Dr. Kukla's report further

25

illustrates that plaintiff has the ability to perform a medium range of work as a cook's helper.

At the June 11, 2008, appointment at MCC, plaintiff reported that she had no complaints and has been "exercising and watching her diet." Tr. 295. This report is vastly different from Dr. Hankin's report that plaintiff had shortness of breath "even sitting at rest" and could not walk more than "a few yards" without becoming short of breath  Tr. 208-09. On this visit, as with the majority of plaintiff's doctor appointments, she denied any fevers, chills, cough, shortness of breath, abdominal pain, nausea, or vomiting. Tr. 295. Dr. Dash furthermore reported that plaintiff was alert, awake, oriented, and in no acute distress. Tr. 295.

On November 20, 2008, plaintiff had a follow-up exam at MCC. Tr. 316. On this occasion, plaintiff did complain of a fever and an increased cough with "yellowish expectoration," as well as pain in her chest upon taking breaths; however, she was found to be in no acute distress and there is no evidence in the record related to this visit indicating that plaintiff could not work. Tr. 316.

An MCC progress report dated April 29, 2009, indicates that plaintiff had been "exercising and eating healthy," just as she had reported in June 2008. Tr. 310. The progress report also documents that plaintiff "plans to go back to do some part time work." Tr. 310.

Dr. Hankin's conclusion that plaintiff is unable to work is a legal conclusion, and the ALJ was under no obligation to give such a conclusion heightened evidentiary value. See 20 C.F.R. § 404.1527(e)(3). As mentioned above, the ALJ cannot, however, simply

26

ignore a treating physician's legal conclusions, but must instead "evaluate all the evidence in the case record to determine the extent to which the [treating physician's legal conclusion] is supported by the record."  Social Security Ruling 96-5p at *3.  In analyzing Dr. Hankin's opinion, the ALJ pointed out that there is no evidence of a "chronic impairment" that would create shortness of breath to the extent alleged and that fatigue is a subjective complaint, which is not supported by plaintiff's physical examinations.  Tr. 23.  The ALJ also points out that there is no evidence of "opportunistic infection."  Tr. 23.  Therefore, the ALJ properly examined Dr. Hankin's opinion, together with the record as a whole, and determined that his opinion was entitled to no weight.  Moreover, there is nothing in the record to support Dr. Hankin's legal conclusion that plaintiff is unable to work.  It is true that on certain dates plaintiff is documented as complaining of shortness of breath or occasional night sweats; however, at no point is there any mention in any of the other medical records that plaintiff simply cannot or should not work.  In fact, the record reflects that on multiple occasions, plaintiff was deemed to have the requisite capacity to perform the medium range of work as a cook's helper.  Dr. Hankin's opinion is simply inconsistent with all of the other physicians' opinions in the record.

In plaintiff's objections to the R&R, her underlying argument is that Dr. Hankin's opinion should have been given more weight because he was the physician in the best position to render an opinion.  This argument does not have support.  Specifically, the record shows that DDS sent a letter to plaintiff dated August 15, 2007, in which she was asked to send to DDS "copies of [her] records or a narrative describing the history, objective findings, severity, onset, and duration of impairment."  Tr. 207.  The letter also

asked that "[for] adults note the individual's ability to perform work-related physical and mental activities."  Tr. 207.  On August 23, 2007, less than two weeks after the date of DDS's letter, plaintiff went to Dr. Hankin for an appointment, which produced the opinion that plaintiff was unable to work.  Therefore, there is evidence that plaintiff went to Dr. Hankin for an evaluation and report for the direct and sole purpose of sending it to DDS, rather than being evaluated by Dr. Dash, whom plaintiff had seen on numerous occasions, was familiar with plaintiff's condition, and had written numerous detailed reports regarding her condition.

The Code of Federal Regulations states that the opinion of a treating physician who treats a patient over time "*may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations* or brief hospitalizations."  20 C.F.R. § 404.1527(d)(2) (emphasis added).  Here, Dr. Hankin provided a one-time consultative examination, which cannot reasonably be found to produce a unique and legitimate perspective when compared to the record as a whole.  In sum, the opinion of Dr. Hankin, based partly on the subjective complaints of plaintiff, are inconsistent with the rest of the medical evidence presented.  The record presents overwhelming contradictory medical evidence which properly allowed the ALJ to give no weight to the opinion of Dr. Hankin regarding plaintiff's alleged disability due to HIV and concurrent and residual problems.

A final issue raised by plaintiff is that the magistrate judge's R&R is an examination of evidence favorable only to the Commissioner and does not examine the

whole record, including evidence contradictory to the Commissioner's position.  This

claim is unsubstantiated because the magistrate judge discusses that none of the doctors

who had seen plaintiff had ever opined that she was disabled.  Furthermore, the

magistrate judge discusses at length the opinion of Dr. Hankin.  Therefore, the magistrate

judge properly examined the evidence and record as a whole.

## IV. CONCLUSION

For the foregoing reasons, the court **ADOPTS** the magistrate judge's R&R and

**AFFIRMS** the Commissioner's decision denying benefits.

**AND IT IS SO ORDERED**.

_____

**DAVID C. NORTON**
**CHIEF UNITED STATES DISTRICT JUDGE**

**March 9, 2011**
**Charleston, South Carolina**

29